**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

```
S. SHANE SMITH,                 )
                                )
                Plaintiff,      )
                                )
        v.                      )          1:16CV396
                                )
FRANK L. PERRY, et al.,         )
                                )
                Defendants.     )
```

<u>**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on a Motion for Summary Judgment (Docket Entry 63), brought by Defendants Frank L. Perry, George T. Solomon, Larry Huggins, Charlotte Williams, Richard L. Neely, Joseph Valliere, Mike Williams, David Livengood, Stephen W. Smith, Amy Leonard, Carol Hurlocker, and Officer Weaver. (<u>See</u> Docket Entry dated Mar. 13, 2018.) For the reasons that follow, the Court should grant in part and deny in part the instant Motion.

<u>BACKGROUND</u>

Plaintiff, a state prisoner proceeding pro se, commenced this action by filing a complaint under 42 U.S.C. § 1983 against more than a dozen state prison officials and employees (in both their individual and official capacities) for injunctive relief and damages. (<u>See</u> Docket Entry 1.)[1] The complaint does not clearly

---

[1] Plaintiff's complaint consists of a five-page form for state prisoner claims under Section 1983 (Docket Entry 1 at 1-5), which
(continued...)

set forth particular claims against particular Defendants. (See id., § IV, ¶¶ 1-75.)  It does, however, generally assert claims against "prison official Defendants" (id., § IV, ¶ 2) for:

1) "not provid[ing] adequate legal services" (id., § IV, ¶ 2.a.);

2) "not answer[ing] or respond[ing] to properly submitted grievances" (id., § IV, ¶ 2.b.);

3) "discriminat[ing] against prisoners with physical disabilities" (id., § IV, ¶ 2.c.);

4) "sexually abus[ing], harass[ing], and manipulat[ing] prisoners in their care" (id., § IV, ¶ 2.d.);

5) "not properly supervis[ing] and/or train[ing] their employees" (id., § IV, ¶ 2.e.); and

6) "engag[ing] in harassment, intimidation, retaliation, threats, and transfers against prisoners who exercise (or attempt to exercise) their protected rights" (id., § IV, ¶ 2.f.).

---

[1](...continued)
(as to all material elements) he completed only by directing the reader to an attached, 18-page, typewritten document, which he signed under penalty of perjury (id. at 6-23).  This Recommendation generally will cite to that latter portion of the complaint by reference to Plaintiff's internal section numbers and paragraph letters/number(s) (e.g., "§ III, ¶ A" or "§ IV, ¶ 1").  Plaintiff also appended 99 pages of exhibits to his complaint.  (Docket Entry 1-1.)  This Recommendation will cite those exhibits by the page number assigned to them in the CM/ECF footer added at docketing.

Defendants Perry, Solomon, Huggins, Charlotte Williams,[2] Neely, Valliere, Mike Williams, Livengood, Smith, Leonard, Hurlocker, and Weaver now have filed the instant Motion (Docket Entry 63), asking "this Court to enter summary judgment for [them]" (id. at 1; see also id. (asserting "that there are no genuine issues of material fact, and they are entitled to a judgment as a matter of law")). In support of the instant Motion, said Defendants submitted a brief (Docket Entry 64), along with "affidavits of Defendants Huggins, Leonard, with attached Exhibits A through D, Livengood, Neely, Smith, Valliere, with attached Exhibits A through H, and Weaver, with attached Exhibit A" (id. at 1 (citing Docket Entries 64-1 through 64-7)).[3] Plaintiff responded

---

[2] Plaintiff's complaint originally named the fourth Defendant as "John/Jane Doe, P.R.E.A. Coordinator, NC Department of Public Safety." (Docket Entry 1, § III, ¶ E.) Early on, however, Plaintiff identified Defendant Charlotte Williams as that Defendant Doe (see Docket Entry 21 at 1-2), the undersigned Magistrate Judge ordered issuance of a summons as to Defendant Charlotte Williams in place of that Defendant Doe (see Text Order dated Aug. 23, 2016), the United States Marshals Service effected service of process on Defendant Charlotte Williams (see Docket Entry 26), and she answered accordingly (see Docket Entry 40 at 4-5).

[3] Exhibit C to Defendant Valliere's affidavit consists of "video footage from two video cameras that recorded the search Defendant Weaver conducted on [Plaintiff] on 13 May, 2015." (Docket Entry 64-6, ¶ 13.) Plaintiff initially objected to the Court considering that footage (see Docket Entry 72), but later moved to withdraw that objection and to have the Court consider an affidavit giving his views about the footage (see Docket Entry 75; see also Docket Entry 76 (Plaintiff's affidavit regarding footage in Exhibit C)), which relief the undersigned Magistrate Judge granted (see Text Order dated July 17, 2018).

(Docket Entry 73)[4] and filed his own affidavit (Docket Entry 74), as well as 29 exhibits (<u>see</u> Docket Entry 70 at 1-2 (cataloging exhibits, docketed as Docket Entries 70-1 through 70-20, Docket Entry 71, and Docket Entries 71-1 through 71-8)).  No reply was filed.  (<u>See</u> Docket Entries dated Feb. 20, 2018, to present.)

DISCUSSION

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Topshelf Mgmt., Inc. v. Campbell-Ewald Co.</u>, 280 F. Supp. 3d 788, 793 (M.D.N.C. 2017) (quoting Fed. R. Civ. P. 56(a)).  "A dispute over a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Wood v. United States</u>, 209 F. Supp. 3d 835, 839 (M.D.N.C. 2016) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  "In considering a summary judgment motion, the [C]ourt must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." <u>Bullock v. United States</u>, 176 F. Supp. 3d 517, 523 (M.D.N.C. 2016).

---

[4] Plaintiff's response addresses both the instant Motion and a separate summary judgment motion filed by Defendant Julia Peeler. (<u>See</u> Docket Entry 73 at 1; <u>see also</u> <u>id.</u> at 3-5 (discussing Defendant Peeler's summary judgment motion), 5-13 (discussing instant Motion); Docket Entry 77 (recommending denial of Defendant Peeler's summary judgment motion).)

<u>Failure to Provide Adequate Legal Services</u>

Plaintiff's complaint first presents a claim against unspecified Defendants for "not provid[ing] adequate legal services to [him] (or other prisoners)[.]" (Docket Entry 1, § IV, ¶ 2.a.) More specifically, it alleges that:

1) "the contracted legal services provider, North Carolina Prisoner Legal Services ('NCPLS') is underfunded and cannot adequately provide the needed legal services to [Plaintiff] (or other prisoners)" (<u>id.</u>, § IV, ¶ 2.a.i.); and

2) "when NCPLS informs [Plaintiff] (or other prisoners) that [NCPLS] cannot provide assistance, Defendants do not provide any alternative legal service or assistance" (<u>id.</u>, § IV, ¶ 2.a.ii. (emphasis omitted)).

The complaint further states that NCPLS has declined requests by Plaintiff for assistance, including because it "did not have the funds to assist [him]" (<u>id.</u>, § IV, ¶ 3), that unspecified "Defendants do not provide or offer [him] (or other prisoners) an alternative if NCPLS declines to help" (<u>id.</u>, § IV, ¶ 4), and that "[b]eing without legal research materials or legal representation has caused [him] harm and [he] ha[s] suffered injury as a result" (<u>id.</u>; <u>see also</u> <u>id.</u>, § IV, ¶ 3 (asserting that simultaneous lack of "access to a law library" and "one trained in the law" "has left [Plaintiff] very vulnerable and at a great disadvantage while trying to maneuver through the legal process")). Finally, the

complaint avers that Plaintiff "made numerous attempts to resolve this issue through unsuccessful communication with prison officials, in particular, Defendants Perry, Solomon, Neely, Valliere, [Mike] Williams, and Leonard. [Plaintiff] ultimately submitted a [grievance], but that too was unsuccessful." (Id., § IV, ¶ 5; see also id., § IV, ¶ 6 ("incorporat[ing] that grievance and corresponding communication"); Docket Entry 1-1 at 4-7 (letter from Plaintiff to Defendant Solomon dated May 17, 2013, enclosing grievance regarding instances in which NCPLS declined to assist Plaintiff and prison officials did not provide law library access, purportedly contrary to United States Supreme Court authority).)

Based on these allegations, it does not appear that Plaintiff actually has asserted an inadequate legal services claim against Defendants Huggins, Charlotte Williams, Livengood, Smith, Hurlocker, and/or Weaver (as none of the allegations pertaining to this claim even mention them).[5] Moreover, because the complaint does not describe any communications about legal services between Plaintiff and Defendants Perry, Neely, Valliere, Mike Williams, or

_____

[5] Nor could Plaintiff likely state any such claim against those Defendants, given the positions he alleged they held (none of which suggest authority over prisoner legal services). (See Docket Entry 1, § III, ¶¶ D (describing Defendant Huggins as "Social Work Programs Director"), E (describing position of Defendant Doe, later identified as Defendant Charlotte Williams, as "P.R.E.A. [Prison Rape Elimination Act] Coordinator"), I (describing Defendant Livengood as "Enterprise Plant Manager"), J (describing Defendant Smith as "Food Service Manager III"), M (describing Defendant Hurlocker as "Correctional Officer"), and N (describing Defendant Weaver as "Correctional Officer").)

Leonard, any claim against them for failing to provide legal services seems tenuous at best. Lastly, given that the grievance Plaintiff forwarded to Defendant Solomon (A) acknowledges that, despite the lack of law library access, Plaintiff successfully instituted actions in four of the five instances when the NCPLS declined to assist him, and (B) does not state why he failed to institute an action in the remaining instance (see Docket Entry 1-1 at 5-6), he likely could not prevail on this claim against Defendant Solomon (or any Defendant), see generally Lewis v. Casey, 518 U.S. 343, 349-55 (1996) (rejecting notion that right of access to courts includes distinct right of prisoners to legal services, requiring proof of actual injury for denial of access to courts claim, and clarifying that right of access to courts protects only ability of prisoners to commence non-frivolous actions).

However, the brief filed in support of the instant Motion does not acknowledge Plaintiff's inadequate legal services claim, much less develop any argument for summary judgment on that claim. (See Docket Entry 64.) Plaintiff therefore has not received a chance to defend the viability of his inadequate legal services claim. Accordingly, at this point, the Court should not resolve that claim by summary judgment. See generally Fed. R. Civ. P. 56(f) (permitting courts to grant summary judgment for "nonmovant," "on grounds not raised by a party," and/or "on its own," only "[a]fter giving notice and a reasonable time to respond").

<u>Failure to Answer Grievances</u>

Second, Plaintiff's complaint seeks relief on the ground that unspecified Defendants "do not answer or respond to properly submitted grievances[.]" (Docket Entry 1, § IV, ¶ 2.b.) This claim fails as a matter of law, because (as the brief supporting the instant Motion argues) "Plaintiff does not have a constitutional right to participate in grievance proceedings" (Docket Entry 64 at 21). <u>See</u> <u>Booker v. South Carolina Dep't of Corr.</u>, 855 F.3d 533, 541 (4th Cir. 2017) ("*Adams* [*v. Rice*, 40 F.3d 72 (4th Cir. 1994)] establishes a clear rule: inmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process, for example.").[6] As a result, on this claim, the Court should enter judgment in favor of each Defendant who filed the instant Motion.

<u>Disability Discrimination</u>

The third claim in Plaintiff's complaint states that unspecified Defendants "discriminate against prisoners with physical disabilities[.]" (Docket Entry 1, § IV, ¶ 2.c.) In connection with that claim, the complaint offers these allegations:

---

[6] In responding to the instant Motion, Plaintiff offered no contrary argument. (<u>See</u> Docket Entry 73 at 5-13.)

1) Plaintiff "suffer[s] from a sever [sic] congenital anatomical disability which left [him] without fingers or toes" (id., § IV, ¶ 7);

2) the North Carolina Department of Public Safety "created a special form for prisoners with disabilities to submit when requesting accommodation pertaining to their disability" (id., § IV, ¶ 8; see also id. ("The form was titled 'DC-746, Request for Reasonable Accommodation.'" (internal parenthetical omitted)));

3) "every time [Plaintiff] made requests for the DC-746 form, [he] was denied" (id., § IV, ¶ 9; but see id., § IV, ¶ 12 ("As a remedy to a prior grievance, Defendant Leonard finally provided [Plaintiff] with numerous copies of the DC-746 form."));

4) Plaintiff "made numerous attempts to resolve this issue through unsuccessful communication with prison officials, in particular, Defendants Perry, Solomon, Huggins, Neely, Valliere, [Mike] Williams, and Leonard" (id., § IV, ¶ 10);

5) Plaintiff "ultimately submitted a grievance complaining that prison officials were not making the DC-746 forms available to [him]" (id.; see also id., § IV, ¶ 11 ("incorporat[ing] that grievance"); Docket Entry 1-1 at 43 (grievance submitted by Plaintiff, dated August 31, 2013, objecting to lack of DC-746 forms), 44 (documenting response to said grievance that, "[a]s of 9/3/2013 all Programs staff and Custody staff have been given copies of the DC 746 so that it is easily accessible to the inmate

population" and that Plaintiff was "given five (5) copies of the blank form per his request, also on this date"));

6) "[o]n approximately September 6, 2013, [Plaintiff] submitted a DC-746 form requesting accommodation for [his] disability using one of the forms provided to [him] by Defendant Leonard" (Docket Entry 1, § IV, ¶ 13; see also Docket Entry 1-1 at 66-68 (accommodation request submitted by Plaintiff on September 6, 2013, in connection with his lack of "fingers or toes" (which makes writing "a difficult and painful process," because, "[i]f [he] must hold a pen/pencil to write for any length of time, [his] hands become so sore and irritated that further tasks, such as holding a fork or other utensil is impossible"), seeking access to "non-network computer so that [he] may adequately complete [his] job assignments," which "include record keeping, report writing, and a lot of written work" (emphasis omitted)));

7) "[l]ong after time had lapsed for prison officials to reply [to that] DC-746 form, [it] was returned to [Plaintiff], and [he] was informed that facility officials (Defendants Neely, Valliere, [Mike] Williams, and Leonard) would not accept [it] solely because [Plaintiff] had 'used the old form'" (Docket Entry 1, § IV, ¶ 14);

8) Plaintiff "made numerous attempts to resolve this issue through unsuccessful communication with prison officials, in particular, Defendants Perry, Solomon, Huggins, Neely, Valliere, [Mike] Williams, and Leonard" (id., § IV, ¶ 15);

9) Plaintiff "ultimately submitted a grievance, but that too was unsuccessful" (id.; see also id., § IV, ¶ 16 ("incorporat[ing] that grievance"); Docket Entry 1-1 at 46-48 (grievance submitted by Plaintiff, dated November 15, 2013, objecting to rejection of DC-746 form, "signed by Annette Foutz on November 14, 2013"), 49-50 (documenting response (dated November 21, 2013) to Plaintiff's grievance (dated November 15, 2013) confirming (A) rejection of DC-746 form, "due to it not being the current version," and (B) provision of current form "to him with this response"), 75-77 (accommodation request submitted by Plaintiff on July 17, 2014 (representing demands from accommodation request he submitted on September 6, 2013), with response from prison officials on August 21, 2014, indicating that Plaintiff "will have access to a typewriter/word processor to be used for his work duties"));

10) "[o]n numerous occasions, [Plaintiff] voiced desire and submitted written requests and applications to facility officials, in particular, Defendants Neely, Valliere, Williams, Livengood, and Leonard that [Plaintiff] be considered for . . . a sentence-reducing, incentive wage prison job assignment in the facility's Correctional Enterprise Industry" (Docket Entry 1, § IV, ¶ 17);

11) "Defendant Livengood refused to give [Plaintiff] an opportunity to work in the Enterprise Industry" (id., § IV, ¶ 18; see also id., § III, ¶ I (describing Defendant Livengood as "Enterprise Plant Manager"));

12) "[t]o [Plaintiff's] knowledge, Defendant Livengood refused to hire [Plaintiff] because of [his] disability" (id., § IV, ¶ 18; id., § IV, ¶ 69 ("Defendant Livengood refused to allow [Plaintiff] assignment to the Enterprise Industry because [Defendant Livengood] suspected [Plaintiff] would require accommodation . . . ."));

13) "[t]o [Plaintiff's] knowledge and observation, Defendant Livengood would not hire inmates with visible physical disabilities" (id., § IV, ¶ 19);

14) Plaintiff "made numerous attempts to resolve this issue through unsuccessful communication with prison officials, in particular, Defendants Perry, Solomon, Huggins, Neely, Valliere, [Mike] Williams, Livengood, and Leonard" (id., § IV, ¶ 20); and

15) Plaintiff "ultimately submitted a grievance, but that too was unsuccessful" (id; see also id., § IV, ¶ 21 ("incorporat[ing] that grievance and corresponding communication")); Docket Entry 1-1 at 52-53 (grievance submitted by Plaintiff, dated April 24, 2015, alleging that "there exists a discriminatory hiring practice by the Correctional Enterprise department" and rhetorically asking if Plaintiff's "requests for assignment [were] being arbitrarily dismissed by [the prison's] Enterprise Plant Manager, [Defendant] Livengood, because [Plaintiff] suffer[s] from a severe anatomical disability"), 54 (documenting, in response to said grievance, that Defendant Livengood "stated that [Plaintiff] ha[d] not purposely been overlooked for a position")).

Plaintiff's complaint thus identifies two forms of alleged disability discrimination: (1) failure to make DC-746 forms available and/or to accept his submission of an out-dated DC-746 form on September 6, 2013; and (2) failure to assign Plaintiff to an Enterprise Plant job. Neither sub-claim can survive the instant Motion. As an initial matter, none of the complaint's disability discrimination allegations refer to Defendants Charlotte Williams, Smith, Hurlocker, and/or Weaver. Additionally, to the extent Plaintiff has made disability discrimination allegations regarding Defendants Perry, Solomon, Huggins, Neely, Valliere, Mike Williams, Livengood, and Leonard, their brief supporting the instant Motion properly observes that, although Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, both generally prohibit exclusion of a qualified prisoner from a prison program because of a disability, "Plaintiff's wholly conclusory discrimination allegations are insufficient to show that he was refused benefits in a correctional setting solely [by reason of (as required by Section 504) or by reason of (as required by Title II of the ADA)] a qualified disability." (Docket Entry 64 at 12.)[7]

_____

[7] Plaintiff's response to the instant Motion did not contest the construction of this claim as arising under the ADA and/or Rehabilitation Act. (See Docket Entry 73 at 5-6.) Even if treated as brought under the Equal Protection Clause of the Fourteenth Amendment (via Section 1983), this claim still would require proof that any "unequal treatment was the result of intentional or

(continued...)

Turning first to the Enterprise Plant job sub-claim, Plaintiff's complaint and his affidavit filed in opposition to the instant Motion acknowledge that Defendant Livengood acted as the hiring decision-maker. (See Docket Entry 1, § IV, ¶¶ 18, 19, 69; Docket Entry 74, ¶¶ 30-32.) Even accepting as fact Plaintiff's hearsay recounting of reports from one correctional officer and unnamed prisoners that "[Defendant] Livengood said he would never hire [Plaintiff] for any position" (Docket Entry 74, ¶ 30) and that "[Defendant] Livengood simply was not going to hire [Plaintiff] because [Defendant Livengood] did not want [Plaintiff] in [the Enterprise Plant]" (id., ¶ 31), Plaintiff has not come forward with any competent evidence[8] tending to show that Defendant Livengood

        [7](...continued)
purposeful discrimination," Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted). That requirement mirrors the demands of the ADA and Rehabilitation Act. See Westminister Nursing Ctr. v. Cohen, No. 5:17CV96, 2017 WL 5632661, at *4 (E.D.N.C. Nov. 22, 2017) (unpublished) (ruling that claim "fail[ed] under the Equal Protection Clause and . . . the ADA and the Rehabilitation Act where [the] plaintiff allege[d] no facts giving rise to an inference of discrimination on the basis of disability"); see also Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1136 (4th Cir. 1988) (holding that standard "developed in the Title VII disparate treatment context . . . is applicable to cases, such as suits under . . . § 1983, where proof of discriminatory intent is required").

        [8] Plaintiff's averment that, he "never witnessed an inmate with a visible physical disability working for [Defendant] Livengood in the [Enterprise Plant]" (Docket Entry 74, ¶ 32) cannot support an inference of discrimination. To begin, Plaintiff's affidavit does not show how many, if any, visibly disabled prisoners applied to work in the Enterprise Plant during that time. (See id.) Without such information, no reasonable fact-finder
                                                        (continued...)

made that decision because of Plaintiff's disability; instead, Plaintiff has offered only his rank speculation that "Defendant Livengood refused to hire [Plaintiff] because of [his] disability" (Docket Entry 1, § IV, ¶ 18) and that "Defendant Livengood refused to allow [Plaintiff] assignment to the Enterprise Industry because [Defendant Livengood] suspected [Plaintiff] would require accommodation" (id., § IV, ¶ 69).[9]

That approach cannot sustain a disability discrimination claim, particularly in the face of Defendant Livengood's explicit, sworn denial of the allegation that he discriminated against Plaintiff based on his disability (see Docket Entry 64-3, ¶ 7). See Forestier Fradera v. Municipality of Mayagüez, 440 F.3d 17, 21 (1st Cir. 2006) ("Even in disability discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported

---

[8](...continued)
could conclude that any statistically-significant exclusion of such prisoners occurred. Further, "statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the [defendant] the burden of rebutting the inference raised by the figures . . . ." Warren v. Halstead Indus., Inc., 802 F.2d 746, 753 (4th Cir. 1986) (emphasis added), adopted, 835 F.2d 535 (4th Cir. 1988) (en banc).

[9] Moreover, Plaintiff's own grievance about his failure to secure a job in the Enterprise Plant offers a non-disability-related explanation. (See Docket Entry 1-1 at 53 (suggesting that Defendant Livengood may have rejected Plaintiff's Enterprise Plant application "because [he] ha[d] been a successful plaintiff in various civil rights litigation against prison officials").)

speculation." (internal brackets and quotation marks omitted));
Hardaway v. Equity Residential Mgmt., LLC, Civ. No. 11-1924, 2012
WL 3903489, at *5-6 (D. Md. Sept. 6, 2012) (unpublished) ("[The
p]laintiffs' subjective belief alone that discrimination was a
motivating factor is insufficient 'to raise a right to relief above
the speculative level.' Accordingly, [the p]laintiffs' claim under
the ADA will be dismissed. Section 504 of the Rehabilitation Act
parallels the ADA . . . . As noted, the instant plaintiffs have
not . . . set forth plausible allegations giving rise to an
inference that the objectionable conduct was related to any
disability. . . . Accordingly, their Rehabilitation Act claim
cannot be sustained." (internal brackets, citation, and heading
omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555
(2007))); see also Ihekwu v. City of Durham, 129 F. Supp. 2d 870,
878 (M.D.N.C. 2000) ("To establish a prima facie case, [the
p]laintiff must show: (1) that he has a disability under the ADA;
(2) that he sought or applied for one or more positions; (3) that
he was otherwise qualified for the position(s) in question; and (4)
that he was denied the position(s) about which he complains under
circumstances giving rise to an inference of disability
discrimination." (emphasis added)).[10]

---

[10] Likewise, in neither his complaint nor his affidavit
opposing summary judgment, has Plaintiff presented evidence from
which a reasonable fact-finder could infer that disability-related
animus caused Defendants Perry, Solomon, Huggins, Neely, Valliere,
(continued...)

Plaintiff's disability discrimination sub-claim predicated on the unavailability of DC-746 forms and the rejection of an out-dated DC-746 form also falls short. Most fundamentally, Plaintiff has not produced any evidence to show that those events actually excluded him from a prison program (let alone due to any Defendant's disability-related bias). In that regard, the accommodation that Plaintiff evidently wished to request when he initially could not find DC-746 forms and that he later requested via an old DC-746 form concerned access to a computer to ease the writing burdens of his job in the dining facility. (See Docket Entry 1-1 at 66-68.) Plaintiff secured that job in July 2013 (see Docket Entry 74, ¶ 41) and, while maintaining it for over a year without access to a computer, he "like[d] to think [he] did the job well" (id., ¶ 44; see also id., ¶¶ 50 ("I had created numerous notebooks to track and properly maintain the inventories, menus, and recipes. These notebooks became an important tool and resource for me and made it possible for me to properly and accurately perform the tasks expected of me from the Food Service Management."), 74-105 (discussing Plaintiff's work in dining facility in 2013-14, including obstacles he faced, but without

---

[10](...continued)
Mike Williams, and/or Leonard (those Defendants to whom Plaintiff reported complaining about his inability to secure assignment to the Enterprise Plant) to refrain from intervening in some fashion to force Defendant Livengood to hire Plaintiff. (See Docket Entry 1, § IV, ¶¶ 17-21, 69, 70; Docket Entry 74, ¶¶ 26-32.)

suggesting that lack of computer access prevented him from keeping his job assignment)).

In sum, Plaintiff's disability discrimination claim fails as a matter of law.[11]

## Failure to Prevent Sexual Abuse

As its fourth claim, Plaintiff's complaint asserts that unspecified Defendants "sexually abuse[d], harass[ed], and manipulate[d] prisoners in their care[.]" (Docket Entry 1, § IV, ¶ 2.d.) In support, the complaint makes these pertinent averments:

1) "[i]n 2014, Defendant [Julia] Peeler involved [Plaintiff] in an unsolicited emotional and physical relationship" (id., § IV, ¶ 22);

2) "Defendant Peeler was [Plaintiff's] work supervisor" (id.; see also id., § III, ¶ K (identifying Defendant Peeler as "Food

---

[11] Alternatively (as argued in the brief supporting the instant Motion (see Docket Entry 64 at 24) and uncontested in Plaintiff's response (see Docket Entry 73 at 1-14)), "the ADA and the Rehabilitation Act do not provide causes of action against individual defendants in their individual capacities." Keith-Foust v. North Carolina Cent. Univ., No. 1:15CV470, 2016 WL 4256952, at *13 (M.D.N.C. Aug. 11, 2016) (unpublished); accord Conklin v. Jefferson Cty. Bd. of Educ., 205 F. Supp. 3d 797, 814 (N.D. W. Va. 2016); McCoy v. Conroy, Civ. No. 01-1581, 2015 WL 1085129, at *3 (D. Md. Mar. 9, 2015) (unpublished); J.W. v. Johnston Cty. Bd. of Educ., No. 5:11CV707, 2012 WL 4425439, at *6 (E.D.N.C. Sept. 24, 2012) (unpublished); Moore v. Ozmint, Civ. No. 3:10-3041, 2012 WL 762460, at *13 (D.S.C. Feb. 16, 2012) (unpublished), recommendation adopted, 2012 WL 762439 (D.S.C. Mar. 6, 2012) (unpublished); Bess v. Kanawha Cty. Bd. of Educ., No. 2:08CV1020, 2009 WL 3062974, at *9 (S.D. W. Va. Sept. 17, 2009) (unpublished); Bracey v. Buchanan, 55 F. Supp. 2d 416, 420 (E.D. Va. 1999).

Service Manager I"); <u>id.</u>, § IV, ¶ 57 ("[Plaintiff] was the inventory clerk for the Food Service Department."));

3) "Defendant Peeler's friend, Defendant Hurlocker, encouraged [Plaintiff] to maintain the relationship with Defendant Peeler" (<u>id.</u>, § IV, ¶ 23; <u>see also</u> <u>id.</u>, § III, ¶ M (identifying Defendant Hurlocker as "Correctional Officer" at Plaintiff's then-prison));

4) Plaintiff "attempted to report this to prison officials, in particular, Defendants Valliere and Smith, but [Plaintiff's] attempts were countered with threats, denials, or [he] was simply ignored or rebuffed" (<u>id.</u>, § IV, ¶ 24; <u>see also</u> <u>id.</u>, § III, ¶¶ G (identifying Defendant Valliere as "Assistant Superintendent" of Plaintiff's then-prison), J (identifying Defendant Smith as "Food Service Manager III"); <u>id.</u>, § IV, ¶¶ 25 ("Defendant Smith served as Defendant Peeler's immediate supervisor. Defendant Smith was involved in a personal and dependent relationship with Defendant Peeler, which rendered him unable or unwilling to intervene in Defendant Peeler's actions."), 26 ("Defendants Smith and Peeler often and regularly reported to work under the influence of controlled substances, which was reported to their supervisors, specifically Defendants Neely and Valliere. No action was ever taken to correct the actions of Defendants Smith or Peeler."), 27 ("When Defendant Smith would be approached or confronted regarding his condition, or the condition of Defendant Peeler, Defendant Smith would begin singing. Sometimes he would sing the childrens'

[sic] song, 'The Wheels on the Bus go Round[] and Round,' indicating that if you did not let it drop, you would be on the transfer bus to another facility."), 28 ("Defendants Neely and Valliere knew of the misdeeds of both Defendants Smith and Peeler, but took no meaningful action to protect [Plaintiff] (or any other prisoner)."), 29 ("Defendant Peeler refused to attend the mandatory staff training - a terminable offense. Defendants Neely, Valliere, and Smith merely ordered her to surrender her pepper spray and handcuffs."), 30 ("Defendants Neely, Valliere, and Smith rendered Defendant Peeler 'uncertified' because she was no longer qualified to possess the required pepper spray and handcuffs, a designation which prohibits uncertified staff to mingle with prisoners inside the facility. However, Defendants Neely, Valliere, and Smith continued to allow Defendant Peeler unfettered access to [Plaintiff] (and other prisoners)."));

5) Plaintiff "made numerous attempts to resolve this issue through unsuccessful communication with prison officials, in particular, Defendants Perry, Solomon, [Charlotte Williams], Neely, Valliere, [Mike] Williams, Smith, and Peeler" (id., § IV, ¶ 31; see also id., § III, ¶¶ B (describing Defendant Perry as "Secretary of Corrections"), C (describing Defendant Solomon as "Director, Division of Prisons"), E (describing Defendant Doe, later identified as Defendant Charlotte Williams, as "P.R.E.A. Coordinator"), F (describing Defendant Neely as "Superintendent" of

Plaintiff's then-prison), H (describing Defendant Mike Williams as "Assistant Superintendent" of said prison);

6) Plaintiff "submitted a grievance" (id., § IV, ¶ 31), which he attached to and "incorporate[d]" into his complaint (id., § IV, ¶ 32; see also Docket Entry 1-1 at 19 (letter dated November 19, 2014, from Plaintiff to "Department of Public Safety, PREA Office" with grievance), 20 ("**Grievance Statement**: A high-ranking prison official . . . has involved me in a [sic] emotional and physical relationship which violated policy and state and federal statutory law (PREA). These encounters have happened within the past twelve months. . . . I am very stressed. I am not eating properly. I have lost nearly 30 pounds. My sleep patterns are erratic. When I do sleep, I am having terrible dreams. I am trying mental health . . . ." (emphasis in original) (signed on October 28, 2014)));[12]

7) "[i]n approximately March of 2015, [Plaintiff] was . . . interviewed by two prison officials" (Docket Entry 1, § IV, ¶ 43);

8) "[t]he two investigators told [Plaintiff] that Defendant [Charlotte Williams] had a grievance forwarded to [her] that [Plaintiff] had written and they were there to investigate" (id., § IV, ¶ 44); and

_____

[12] The acronym "PREA" refers to the Prison Rape Elimination Act, a federal statute "intended to address the problem of rape in prison, [which] authorizes grant money[] and creates a commission to study the issue. [It] does not grant prisoners any specific rights." Chapman v. Willis, No. 7:12CV389, 2013 WL 2322947, at *4 (W.D. Va. May 28, 2013) (unpublished) (internal ellipsis and quotation marks omitted).

9) "Defendant Peeler was charged with three (3) counts of sexual misconduct by a government employee" (id., § IV, ¶ 47).

Defendant Peeler's answer admits that she and Plaintiff engaged in "an emotional and physical relationship," but asserts that he "initiated" it. (Docket Entry 46, ¶ 22.)  In addition, Defendant Peeler's answer concedes that, "[a]s a result of said conduct[, she] was terminated from her position as Food Service Manager I . . . . [She] was charged with three counts of sexual misconduct by a government employee. . . . [She] plead[ed] guilty to one count of crimes against nature . . . ." (Id.)[13]  Defendant Peeler subsequently filed a summary judgment motion (Docket Entry 60),[14] along with an affidavit (Docket Entry 60-1), which states: "I did have an inappropriate relationship with Plaintiff [].  However, I take issue with his allegation that I solicited him.  In fact, he flirted with me repeatedly and otherwise enticed me into the inappropriate activities.  The relationship was at all time [sic] and in every way consensual." (Id., ¶ 10.)

---

[13] North Carolina's crimes against nature statute, N.C. Gen. Stat. § 14-177, originally proscribed "all forms of oral and anal sex," State v. Stiller, 162 N.C. App. 138, 140 (2004); however, following the ruling in Lawrence v. Texas, 539 U.S. 558 (2003), the North Carolina Court of Appeals restricted the statute's "use[] to prosecut[ion of] conduct in which a minor is involved, conduct involving non-consensual or coercive sexual acts, conduct occurring in a public place, or conduct involving prostitution or solicitation," State v. Whiteley, 172 N.C. App. 772, 779 (2005), quoted with approval, State v. Hunt, 365 N.C. 432, 440 (2012).

[14] The undersigned Magistrate Judge has recommended denial of Defendant Peeler's summary judgment motion. (See Docket Entry 77.)

Plaintiff's affidavit opposing both Defendant Peeler's summary judgment motion and the instant Motion includes these statements of potential relevance to this sexual abuse-related claim:

1) Plaintiff "was arrested at the age of 20, and was subsequently admitted to the North Carolina Department of Public Safety . . . where [he] remain[s]" (Docket Entry 74, ¶ 2);

2) "[p]rior to [his] arrest and incarceration, [Plaintiff] lived [his] entire life with [his] biological parents" (id., ¶ 3);

3) Plaintiff "ha[s] never had a real adult relationship" (id., ¶ 5);

4) Plaintiff "ha[s] no fingers or toes" (id., ¶ 6);

5) "[w]ith [his] disability, [Plaintiff is] often and regularly ostracized" (id., ¶ 14);

6) "[s]ometime during the fall of 2013, [Defendant] Peeler . . . transferred . . . to the [prison dining] facility where [Plaintiff] worked" (id., ¶ 45);

7) "[Defendant] Smith and [Defendant] Peeler had both told [Plaintiff] that [Defendant] Peeler . . . rented [a] residence from [Defendant] Smith" (id., ¶ 56);

8) Plaintiff learned, "through conversations with [Defendant] Peeler, that she regularly loaned money and provided prescription medications to [Defendant] Smith" (id., ¶ 61; see also id., ¶ 51 ("[Plaintiff] personally and regularly observed [Defendant] Smith

and [Defendant] Peeler working under the influence of heave [sic] prescription-strength medications.'"));

9) "[o]n approximately January 17, 2014, while [Plaintiff] was working [his] assigned job [in the dining facility], [Defendant] Peeler walked up to [Plaintiff], looked [him] squarely in the eyes, and simply said, 'I could have you if I wanted'" (<u>id.</u>, ¶ 64);

10) Plaintiff "responded . . ., 'No, you could not'" (<u>id.</u>);[15]

11) Plaintiff "did not solicit [Defendant] Peeler's attentions, nor did [he] want [her] attentions" (<u>id.</u>, ¶ 66);

12) Plaintiff "even tried to resist [Defendant] Peeler's attentions" (<u>id.</u>);

---

[15] According to the "PREA Investigation Notes" (compiled by Captain Jean Martin of the North Carolina Department of Public Safety) filed with Plaintiff's response to the instant Motion, he recounted that same event in an interview on January 9, 2015. (Docket Entry 71 at 12; <u>accord</u> <u>id.</u> at 31; Docket Entry 71-1 at 2.) At that time, Plaintiff also stated that, on one occasion, when he "[t]ried to break it off w[ith Defendant Peeler], . . . she had dropped her pants and he had intercourse with her." (Docket Entry 71 at 13-14; <u>see also</u> <u>id.</u> at 15 ("[Defendant Peeler] performed oral sex on [Plaintiff] . . . . [H]e did tell her to stop, [and that he] did not want her attention."), 31 ("[O]ne day in approximately May 2014, [Plaintiff] had told [Defendant] Peeler that [Plaintiff] could not continue the path [they] were on. [Plaintiff] said that [Defendant] Peeler wrote a note to [Plaintiff] that simply said, 'Don't want to lose you!' [Defendant] Peeler asked [Plaintiff] for a hug. She pulled down her pants, grabbed [his] crotch, and said 'Fuck me!' [They] engaged in intercourse."); Docket Entry 71-1 at 3 ("When asked if he told [Defendant Peeler] to stop [Plaintiff] stated he did tell her to stop, that he did not want her attention . . . ." (all-caps font altered)).)

-24-

13) "[f]rom the early onset of being pursued by [Defendant] Peeler, [Plaintiff] told her that [he] would not go down that road with her" (id., ¶ 67);

14) Defendant Peeler "wrote [Plaintiff] a note on a yellow Post-It note pad proclaiming that she did not want to lose [him]" (id.; see also id. ("A copy of that note is attached hereto as **Exhibit 06.**" (emphasis in original)); Docket Entry 70-6 at 1 (document marked "EXHIBIT 06" stating "Don't want to lose you!"));

15) "[Defendant] Peeler brought [Plaintiff] pictures of herself" (Docket Entry 74, ¶ 68; see also id. ("A copy of the pictures is attached hereto as **Exhibit 07.**" (emphasis in original)); Docket Entry 70-7 at 1 (photocopy of photographs marked "EXHIBIT 07"));

16) Defendant Peeler "also mailed [Plaintiff] numerous cards" (Docket Entry 74, ¶ 69; see also id. ("A copy of those cards are [sic] attached hereto as **Exhibit 08.**" (emphasis in original)); Docket Entry 70-8 at 1-20 (photocopies of cards and envelopes marked "EXHIBIT 08")); and

17) to send those cards, Defendant Peeler used "an assumed name of her long-time friend, [Defendant] Hurlocker," as well as Defendant Hurlocker's address (Docket Entry 74, ¶ 70; see also id., ¶ 71 ("[Plaintiff] also received mail from [Defendant] Hurlocker, also under [that assumed name]. A copy of that communication is attached hereto as **Exhibit 10.**" (emphasis in original)); Docket

Entry 70-10 at 1-4 (envelope and letter marked "EXHIBIT 10" in which Defendant Hurlocker (using an assumed name) "beg[s Plaintiff] not to leave [Defendant Peeler]" and states that "God put [Plaintiff] and [Defendant Peeler] on a path together")).

Additionally, among his exhibits, Plaintiff submitted "PREA Investigation Notes" and witness statements taken by Captain Jean Martin of the North Carolina Department of Public Safety, documenting that:

1) a Salisbury Police Department detective confirmed that, on February 3, 2015, Defendant Peeler "confessed to two oral sex incidents and one vaginal intercourse incident[]" with Plaintiff, but "tried to say [he] forced her on the intercourse incident" (Docket Entry 71 at 18); and

2) on February 5, 2015, Defendant Peeler admitted to Captain Martin that Defendant Peeler and Plaintiff engaged in intercourse "vaginally" (once) and "oral sex" ("2 times"), although Defendant Peeler contended that, as to the former, she "tr[ied her] best to make him stop but he was very forceful and he kept going pulling at [her] clothes" and she "kept telling him to quit but [she] was unable to stop him" and, as to the latter, she "felt trapped" (id. at 37; see also Docket Entry 71-1 at 5 ("[Defendant] Peeler confessed that she had had a relationship with [Plaintiff]. [Defendant] Peeler stated that the oral sex and intercourse did happen but that she had tried to say no." (all-caps font altered)),

6 ("[Defendant Peeler] admitted that she also gave a copy of [two] photos [of herself] to [Plaintiff]. . . . [Defendant Peeler] stated that . . . [Defendant] Hurlocker actually wrote and mailed the cards [to Plaintiff] for [Defendant Peeler]. She stated she would tell [Defendant] Hurlocker what to write and [Defendant Hurlocker] would. . . . [Defendant] Peeler stated she performed oral sex on [Plaintiff] in the dairy cooler one time and performed oral sex [on] and had intercourse [with him] one time in the commissary. . . . [Defendant] Peeler continued to state that [Plaintiff] 'forced' her to have intercourse. Due to his physical disability it would be very hard for him to unbutton her correctional officer uniform, pull her pants down, and perform sex if she was indeed fighting him. However, she continued to state she was afraid of him." (all-caps font altered))).[16]

"Sexual abuse of an inmate may be actionable where a correctional officer is in a position of authority over a prisoner. Sexual assault is 'not a legitimate part of a prisoner's punishment, and the substantial physical and emotional harm[s] suffered by a victim of such abuse are compensable injuries' under Section 1983." Smith v. Beck, No. 1:08CV166, 2011 WL 65962, at *5 (M.D.N.C. Jan. 10, 2011) (unpublished) (quoting Berryhill v.

---

[16] Defendants who filed the instant Motion could have filed a reply "object[ing] that th[is] material . . . cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), but they chose not to do so (see Docket Entries dated Feb. 20, 2018, to present).

Schriro, 137 F.3d 1073, 1076 (8th Cir. 1998)), recommendation adopted, 2012 WL 1340766 (M.D.N.C. Apr. 18, 2012) (unpublished), aff'd, 577 F. App'x 196 (4th Cir. 2014); see also Jackson v. Holley, 666 F. App'x 242, 244 (4th Cir. 2016) ("There can be little doubt that sexual abuse is repugnant to contemporary standards of decency, and that allegations of sexual abuse can amount to an Eighth Amendment violation.").  Consistent with that view, the United States Supreme Court has held that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 199–200 (1989) (emphasis added).  In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment . . . ." Id. at 200 (emphasis added).

However, not every injury suffered by a prisoner "translates into constitutional liability for prison officials responsible for the victim's safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). To the contrary, such liability cannot attach absent proof of these two elements:

First, a constitutional violation occurs only where the
deprivation alleged is "objectively, sufficiently
serious." For a claim based on a failure to prevent
harm, a [plaintiff] must show that he [was] detained or
incarcerated "under conditions posing a substantial risk
of serious harm." . . . Second, an official must have
"a sufficiently culpable state of mind." In prison-
conditions cases, the requisite state of mind is
"deliberate indifference."

Brown v. Harris, 240 F.3d 383, 388-89 (4th Cir. 2001) (quoting

Farmer, 511 U.S. at 834) (internal citations and secondary internal

quotation marks omitted) (emphasis added).

"Deliberate indifference is a very high standard -- a showing

of mere negligence will not meet it." Grayson v. Peed, 195 F.3d

692, 695 (4th Cir. 1999). Instead, the "deliberate indifference"

element of an Eighth Amendment, failure-to-prevent-sexual-abuse

claim requires a plaintiff to make "two showings":

First, the evidence must show that the official in
question subjectively recognized a substantial risk of
harm. It is not enough that the officers *should have*
recognized it; they actually must have *perceived* the
risk. Second, the evidence must show that the official
in question subjectively recognized that his [or her]
actions were inappropriate in light of that risk. As
with the subjective awareness element, it is not enough
that the official *should have* recognized that his [or
her] actions were inappropriate; the official actually
*must have* recognized that his [or her] actions were
insufficient.

Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)

(internal citations and quotation marks omitted) (emphasis in

original); see also Brown v. North Carolina Dep't of Corr., 612

F.3d 720, 723 (4th Cir. 2010) ("In other words, the test is whether

the [defendants] kn[e]w the plaintiff inmate face[d] a serious

danger to his safety and they could avert the danger easily yet they fail[ed] to do so." (internal quotation marks omitted)). "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto v. Stansberry, 841 F.3d 219, 226 (4th Cir. 2016) (internal quotation marks omitted).

The brief supporting the instant Motion argues for summary judgment on Plaintiff's failure-to-prevent-sexual-abuse claim as follows:

> Plaintiff can put forward no facts to satisfy either of the requirements as outlined in *Farmer*. First, Plaintiff cannot show that his exposure to Defendant[] Peeler . . . constituted a "substantial risk of serious harm." Second, Plaintiff cannot show that Defendants Perry, Solomon, Valliere, Neely, Mike Williams, Hurlocker, [Charlotte Williams, and Smith] were deliberately indifferent to [Plaintiff's] health and possessed a sufficiently culpable state of mind.

(Docket Entry 64 at 19.)[17]

---

[17] The above-quoted argument does not reference Defendants Huggins, Livengood, or Leonard, for the obvious reason that Plaintiff's averments about sexual abuse by Defendant Peeler (detailed above) do not mention, much less implicate, those three Defendants. Nor does Plaintiff's response to the instant Motion suggest that he had stated (or could maintain) a sexual abuse-related claim against them. (See Docket Entry 73 at 7.) Accordingly, to the extent Plaintiff's complaint asserts any sexual abuse-related claim against Defendants Huggins, Livengood, and Leonard, the Court should enter summary judgment for them. The
(continued...)

The Court should reject that argument as to Defendants Valliere, Smith, and Hurlocker, but should grant summary judgment for Defendants Perry, Solomon, Neely, Mike Williams, and Charlotte Williams. Beginning with Defendant Hurlocker, taken in the light most favorable to Plaintiff, the record evidence (detailed above) would support a finding that Defendant Hurlocker (A) knew that Defendant Peeler had used her position as Plaintiff's prison work supervisor to engage him in a sexual relationship, (B) did not

---

[17](...continued)
above-quoted argument also lists "Stephen Williams" as a Defendant against whom Plaintiff's sexual abuse-related claim fails as a matter of law. (See Docket Entry 64 at 19.) That listing appears to represent a scrivener's error combining the names of Defendants Steven Smith and Charlotte Williams (references to both of whom do appear in the complaint's sexual abuse-related allegations – again, detailed above). As indicated (with brackets) in the quotation above, this Recommendation proceeds on that assumption. The quotation above also omits the reference to Defendant Weaver that appears in the original text of the brief in support of the instant Motion (see id.). That brief (reasonably) discusses Defendant Weaver in connection with Plaintiff's sexual-abuse-related claim because, immediately after setting forth the allegations about Defendant Peeler, Plaintiff's complaint alleges that "Defendants do nothing to dissuade instances of undue familiarity between prisoners and staff" (Docket Entry 1, § IV, ¶ 33), that "Defendant Weaver has a known reputation among prisoners and staff as being overly open and flirty" (id., § IV, ¶ 34), and that, on May 13, 2015, while "perform[ing] a pat down search of [Plaintiff], [Defendant Weaver] stuck her hand deep into [his] front pants pocket" (id., § IV, ¶ 35; see also id., § IV, ¶ 40 ("After I complained to Defendants that Defendant Weaver had placed her hand in my pants pocket, Defendants reviewed the security cameras and Defendant Weaver was reassigned to another facility[.]")). Plaintiff's response opposing the instant Motion, however, makes clear that he "did not allege sexual abuse by Defendant Weaver." (Docket Entry 73 at 7.) Given that clarification, no reason exists to discuss Defendant Weaver (or the search on May 13, 2015) in relation to Plaintiff's sexual abuse-related claim.

report that criminal conduct to proper authorities, but instead (C) assisted Defendant Peeler in covertly communicating with Plaintiff to maintain the relationship, and (D) used a false name to write her own letter to Plaintiff encouraging him to continue the relationship with Defendant Peeler.[18]  Such conduct would satisfy both elements of a claim that Defendant Hurlocker violated Plaintiff's Eighth Amendment rights by failing to protect him from sexual abuse, i.e., such conduct would establish that Plaintiff (1) faced a substantial risk of sexual abuse by Defendant Peeler (2) to which Defendant Hurlocker exhibited deliberate indifference.

Regarding the first element, a sexual relationship between a prison official and a prisoner under that official's authority poses an obvious, "substantial risk of serious harm," Farmer, 511 U.S. at 834.  As another court has observed:

> That risk is acknowledged in [applicable] state law, which pronounces prisoners categorically incapable of consenting to any sexual activity with guards, and subjects guards to criminal liability for such conduct. In short, these laws recognize the moral certainty of guards confronting prisoners in sexually tempting circumstances with such a frequent risk of harm to prisoners as to require a complete prohibition on any sexual activity.

---

[18] As to Defendant Hurlocker's knowledge of the sexual nature of Defendant Peeler's relationship with Plaintiff, one of the cards that Plaintiff submitted as an exhibit (and that Defendant Peeler acknowledged having Defendant Hurlocker write and send to Plaintiff using an assumed name) includes the following language:  "I will love you until the day I am called home.  I know now that their [sic] is a difference in being available for sex and making love. . . .  I do love you.  And I know know [sic] the big difference in making love and being in love."  (Docket Entry 70-8 at 13.)

Cash v. County of Erie, 654 F.3d 324, 335 (2d Cir. 2011) (internal citations omitted); see also N.C. Gen. Stat. § 14-27.31(b) ("If . . . a person who is an agent or employee of any . . . institution . . . having custody of a victim of any age engages in vaginal intercourse or a sexual act with such victim, the defendant is guilty of a Class E felony.") & (c) ("Consent is not a defense to a charge under this section.")).[19]  Further, Defendant Hurlocker's use of a false name to conceal her efforts to perpetuate Defendant Peeler's relationship with Plaintiff, as well as the obvious nature of the risk of harm to Plaintiff from that relationship, raise a question of fact on the second (mens rea) element (thus precluding summary judgment).  See Scinto, 841 F.3d at 226 ("A plaintiff can meet the subjective knowledge requirement [of the deliberate indifference mental element] through direct evidence of a prison official's actual knowledge [of the risk of harm] or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious." (internal quotation marks omitted)); see also United States v. Oyakhire, 431 F. App'x 126, 127 (3d Cir. 2011) ("[A] factfinder may infer consciousness of guilt from a defendant's attempt to conceal his true identity by using an alias.").

---

[19] For purposes of Section 14-27.31(b), "sexual act" includes oral sex.  See N.C. Gen. Stat. § 14-27.20(4).

Unlike Plaintiff's failure-to-prevent-sexual-abuse claim against Defendant Hurlocker (which, as shown in the prior discussion, rests upon not only Plaintiff's statements, but also Defendant Peeler's statements and corroborating documentation), Plaintiff's concomitant claim against Defendants Valliere and Smith depends entirely on Plaintiff's words (albeit offered under penalty of perjury). Most significantly, immediately after averring that Defendant Peeler "involved [Plaintiff] in an unsolicited emotional and physical relationship" (Docket Entry 1, § IV, ¶ 22), which Defendant Hurlocker "encouraged [him] to maintain" (id., § IV, ¶ 23), Plaintiff averred that he "attempted to report this to prison officials, in particular, Defendants Valliere and Smith, but [his] attempts were countered with threats, denials, or [he] was simply ignored or rebuffed" (id., § IV, ¶ 24 (emphasis added)). Although Plaintiff obviously could have provided a more detailed description of exactly how and what he "attempted to report" (id.) to Defendants Valliere and Smith (as well as of exactly how they responded), viewed in the light most favorable to Plaintiff, with the benefit of all permissible inferences, his foregoing statement constitutes competent evidence that (A) Plaintiff told Defendants Valliere and Smith that Defendant Peeler had engaged Plaintiff in an unwanted physical relationship, which Defendant Hurlocker had pressured Plaintiff to continue, but (B) Defendants Valliere and Smith willfully disregarded that information.

Such findings, in turn, would support a verdict for Plaintiff on his failure-to-prevent-sexual-abuse claim, in light of the obvious, substantial risk of serious harm to a prisoner (like Plaintiff) subjected to such a relationship by a supervising prison official (like Defendant Peeler), not to mention Defendant Valliere's responsibilities as an Assistant Superintendent of the prison and Defendant Smith's role as Defendant Peeler's supervisor, which would have required each to take some action if, in fact, they had received such a report (as they effectively have conceded (see Docket Entry 64-5, ¶ 17; Docket Entry 64-6, ¶ 9)).  See Scinto, 841 F.3d at 226; Cash, 654 F.3d at 335.  "In other words, [a reasonable fact-finder could conclude that Defendants Valliere and Smith] kn[e]w [Plaintiff] face[d] a serious danger to his safety and they could [have] avert[ed] the danger easily yet they fail[ed] to do so."  Brown, 612 F.3d at 723 (internal quotation marks omitted).  The Court therefore should deny summary judgment for Defendants Valliere and Smith on this claim.[20]

---

[20] Defendant Smith has sworn that Plaintiff "never reported any allegations of an alleged sexual relationship between him and Defendant Peeler [to Defendant Smith]" (Docket Entry 64-5, ¶ 13) and Defendant Valliere has sworn that Plaintiff "never told [Defendant Valliere] about or attempted to communicate with [him] in reference to [Plaintiff's] personal relationship with  . . . Defendant Peeler" (Docket Entry 64-6, ¶ 10).  Because that evidence runs counter to the above-discussed evidence offered by Plaintiff, the record contains "materially conflicting versions of events that cannot be reconciled . . . without weighing credibility, which this [C]ourt is precluded from doing at this stage.  Accordingly, it will be for the jury to determine whose version of the facts to
(continued...)

A different result, however, should obtain as to Defendants Perry, Solomon, Charlotte Williams, Neely, and Mike Williams. Plaintiff's complaint asserts that he "made numerous attempts to resolve this issue through unsuccessful communication with [those Defendants] . . . ." (Docket Entry 1, § IV, ¶ 31 (emphasis added).) However, in contrast to the above-discussed (sufficient) inferential connection (due to the proximity) between the complaint's allegations that Defendant Peeler "involved [Plaintiff] in an unsolicited emotional and physical relationship" (id., § IV, ¶ 22), which Defendant Hurlocker "encouraged [him] to maintain" (id., § IV, ¶ 23), and the allegation that Plaintiff "attempted to report this to . . . Defendants Valliere and Smith" (id., § IV, ¶ 24 (emphasis added)), the allegation that Plaintiff communicated with Defendants Perry, Solomon, Charlotte Williams, Neely, and Mike Williams about "this issue" (id., § IV, ¶ 31) does not adequately indicate that Plaintiff reported sexual abuse to them. Most significantly, that vague reference to Plaintiff's communication with those Defendants about "this issue" (id.) does not directly follow the complaint's allegations about Plaintiff's relationship with Defendant Peeler; rather, it comes after a lengthy series of allegations about other matters, such as Defendants Smith and Peeler reporting to work under the influence of prescription drugs,

---

Defendant Smith singing a children's song to discourage prisoners from questioning him about his or Defendant Peeler's impaired condition, Defendants Neely's and Valliere's knowledge that Defendants Smith and Peeler worked while impaired, Defendant Peeler's failure to attend training (and resultant loss of authority to carry pepper spray and handcuffs), and the decision by Defendants Neely, Valliere, and Smith to allow Defendant Peeler to continue working among prisoners despite that loss of authority. (See id., § IV, ¶¶ 26-30.)  Simply put, no reasonable basis exists for a fact-finder to infer that Plaintiff's communications with Defendants Perry, Solomon, Charlotte Williams, Neely, and Mike Williams about "this issue" (id., § IV, ¶ 31) concerned sexual abuse.  Given the absence of any other evidence showing that those Defendants received notice of Plaintiff suffering sexual abuse, his failure-to-prevent-sexual-abuse claim against them cannot succeed. See Parrish, 372 F.3d at 303 (discussing mens rea element).

    As a result, the Court should deny summary judgment on this claim as to Defendants Valliere, Smith, and Hurlocker, but should grant summary judgment on this claim as to the other Defendants who filed the instant Motion.

### Failure to Supervise/Train

    The fifth claim in Plaintiff's complaint seeks relief against unspecified "prison official Defendants" for "not properly supervis[ing] and/or train[ing] their employees[.]"  (Docket Entry

1, § IV, ¶ 2.e.)  As a neighboring court recently explained (by borrowing liberally from a United States Supreme Court decision):

> "There are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).  Among the elements for advancing a "failure to train" claim, [ P]laintiff must show that the allegedly deficient training practices actually caused the <u>deliberate indifference</u> and the ultimate injury [P]laintiff suffered. *Id.* at 389, 391.  Where Plaintiff fails to show that any prison officials . . . violated his Eighth Amendment rights, he is also unable to demonstrate that any training practice overseen by [any] Defendants . . . was responsible for any violation of []his Eighth Amendment rights.

<u>Owle v. Solomon</u>, No. 5:16CV25, 2017 WL 2262419, at *10 (W.D.N.C. May 23, 2017) (unpublished) (internal brackets omitted) (emphasis added); <u>see also</u> <u>Simmons v. Corizon Health, Inc.</u>, 136 F. Supp. 3d 719, 723 (M.D.N.C. 2015) ("Inadequate training 'may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference.'" (quoting <u>City of Canton</u>, 489 U.S. at 390)).  Likewise, to establish Section 1983 liability for inadequate supervision, Plaintiff (at a minimum) must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like [ P]laintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show <u>deliberate indifference</u> to or tacit authorization of the alleged offensive practices[]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by [ P]laintiff.

<u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted) (emphasis added).

As discussed in the preceding subsection, viewing the evidence in the light most favorable to Plaintiff and granting him the benefit of all permissible inferences, a reasonable fact-finder could conclude that Plaintiff told Defendants Valliere and Smith that Defendant Peeler had engaged Plaintiff in a physical relationship (which posed an obvious risk of serious harm to him), but they responded with deliberate indifference. Those same considerations would support a claim against Defendants Valliere and Smith on a failure-to-supervise/train theory (although any such claim would merely duplicate the failure-to-prevent-sexual-abuse claim against them that the preceding subsection proposes should proceed to trial). Conversely, the same conclusion that warrants summary judgment on Plaintiff's failure-to-prevent-sexual-abuse claim in favor of all Defendants who filed the instant Motion besides Defendants Valliere, Smith, and Hurlocker[21] – i.e., that the record lacks any evidence to support a finding that Defendants Perry, Solomon, Huggins, Charlotte Williams, Neely, Mike Williams, Livengood, Leonard, and Weaver knew Plaintiff had endured any sexual abuse, such that he cannot show that they exhibited

---

[21] Because Plaintiff has not come forward with any evidence that Defendant Hurlocker exercised supervisory authority over or training responsibility for Defendant Peeler, but instead has identified Defendant Hurlocker only as a "Correctional Officer" (Docket Entry 1, § III, ¶ M), Plaintiff cannot maintain any failure-to-supervise/train claim against her.

deliberate indifference – also entitles those Defendants to summary judgment on this failure-to-supervise/train claim.[22]

<u>Retaliation for Exercising Protected Rights</u>

Sixth (and finally), Plaintiff's complaint asserts that unspecified Defendants "engage[d] in harassment, intimidation, retaliation, threats, and transfers against prisoners who exercise (or attempt to exercise) their protected rights." (Docket Entry 1, § IV, ¶ 2.f.) Elsewhere, the complaint generically states that Plaintiff "ha[s] suffered harassment, intimidation and retaliation from the Defendants, in particular, Defendants Perry, Solomon, Huggins, [Charlotte Williams], Neely, Valliere, [Mike] Williams, Livengood, Leonard, and Weaver." (<u>Id.</u>, § IV, ¶ 53.) The portions of the complaint that offer substantive allegations conceivably connected to this claim, however, do not actually implicate Defendants Perry, Solomon, Huggins, Charlotte Williams, Mike Williams, and/or Leonard in such conduct; to the contrary, the complaint (at most) accuses said Defendants of "unsuccessful[ly] communicati[ng]" with Plaintiff in his "attempts to resolve"

---

[22] To the extent the complaint would rest this failure-to-supervise/train claim on matters other than Plaintiff's sexual abuse by Defendant Peeler (such as Defendant Smith's and Defendant Peeler's impairment while working and/or Defendant Peeler's loss of authority to carry pepper spray and handcuffs), Plaintiff has not shown that those events implicated his federal statutory/ constitutional rights and/or caused him injury. Accordingly, any related claim for failure to supervise/train against any Defendant would fail as a matter of law. <u>See</u> <u>Shaw</u>, 13 F.3d at 799; <u>Owle</u>, 2017 WL 2262419, at *10.

perceived retaliatory acts by others (including Defendants Neely, Valliere, Livengood, Smith, and Weaver). (<u>Id.</u>, § IV, ¶¶ 39 (referencing contact with Defendants Mike Williams and Leonard about fabricated infraction charge brought by Defendant Weaver (<u>see id.</u>, § IV, ¶¶ 36-38)), 51 (referencing contact with Defendants Perry, Solomon, Charlotte Williams, Mike Williams, and Leonard about unidentified prison employee's circulation of news story on Defendant Peeler's arrest (<u>see id.</u>, § IV, ¶¶ 49, 50)), 70 (referencing contact with Defendants Perry, Solomon, Huggins, Charlotte Williams, Mike Williams, and Leonard about alteration of Plaintiff's medical restrictions (by Defendant Valliere) (<u>see id.</u>, § IV, ¶¶ 55-56), confiscation of Plaintiff's inventory tools (by Defendants Neely, Valliere, and Smith) (<u>see id.</u>, § IV, ¶ 57), exclusion of Plaintiff from certain dining facility areas (by Defendants Neely and Valliere) (<u>see id.</u>, § IV, ¶¶ 60, 64-67), assessment of false infraction for unauthorized presence in dining facility office (by Defendant Valliere) (<u>see id.</u>, § IV, ¶ 62), and/or refusal to employ Plaintiff in Enterprise Plant (by Defendant Livengood) (<u>see id.</u>, § IV, ¶ 69)), 74 (referencing contact with Defendants Perry, Solomon, Huggins, Charlotte Williams, Mike Williams, and Leonard about Plaintiff's transfer to a different prison (<u>see id.</u>, § IV, ¶¶ 72-73))).)[23]

---

[23] The complaint thus does not mention Defendant Hurlocker in relation to any aspect of this retaliation claim.

"[P]rison officials cannot retaliate against inmates for exercising a constitutional right." Booker, 855 F.3d at 543. In particular, the United States Court of Appeals for the Fourth Circuit "has long held that prison officials may not retaliate against prisoners for exercising their right to access the courts, which is a component of the [First Amendment] right to petition for redress of grievances." Id. at 544 (internal citation omitted). In addition, the Fourth Circuit recently ruled that the "right to file a prison grievance free from retaliation [i]s clearly established under the First Amendment." Id. at 545. However, the Fourth Circuit also has recognized that retaliation claims "pose particular problems in the context of prison administration. . . . The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism . . . ." Adams, 40 F.3d at 74.

"A plaintiff seeking to assert a § 1983 claim on the ground that he experienced government retaliation for his First Amendment-protected speech must establish three elements: (1) his speech was protected, (2) the alleged retaliatory action adversely affected his protected speech, and (3) a causal relationship between the protected speech and the retaliation." Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015) (internal quotation marks omitted) (emphasis added). As to the first of these

elements, as noted above, accessing the courts and filing grievances constitute forms of protected speech. See Booker, 855 F.3d at 544-45. "[F]or purposes of [the second element of] a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks omitted). Lastly, the third element's "causal requirement is rigorous. It is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the state actor would not have taken the alleged retaliatory action." Raub, 785 F.3d at 885 (internal brackets, citation, and some quotation marks omitted).

As indicated above, Plaintiff's complaint describes eight different sub-claims of retaliation:

1) a fabricated infraction charge for possessing excess stamps brought by Defendant Weaver (see Docket Entry 1, § IV, ¶¶ 36-38);

2) an unidentified prison employee's circulation of a news story on Defendant Peeler's arrest (see id., § IV, ¶¶ 49, 50);

3) Defendant Valliere's alteration of Plaintiff's medical restrictions (see id., § IV, ¶¶ 55-56);

4) confiscation of Plaintiff's inventory tools by Defendants Neely, Valliere, and Smith (see id., § IV, ¶ 57);

5) exclusion of Plaintiff from certain dining facility areas by Defendants Neely and Valliere (see id., § IV, ¶¶ 60, 64-67);

6) a false infraction charge for unauthorized presence in a dining facility office by Defendant Valliere (see id., § IV, ¶ 62);

7) Defendant Livengood's refusal to employ Plaintiff in the Enterprise Plant (see id., § IV, ¶ 69); and

8) a prison transfer ordered by unidentified person(s) (see id., § IV, ¶¶ 72-73).

Regarding the first sub-claim, the complaint alleges that, "[o]n approximately May 13, 2015, as [Plaintiff] was leaving [his] assigned work site, Defendant Weaver was working the Food Service security post." (Id., § IV, ¶ 34.) According to the complaint, while "perform[ing] a pat search of [Plaintiff], [Defendant Weaver] stuck her hand deep into [Plaintiff's] front pants pocket. [Plaintiff] was startled. [He] said . . . [he] would prefer it if she did not put her hands in [his] pants pockets. Defendant Weaver became visibly irate." (Id., § IV, ¶ 35.) The complaint alleges that, in retaliation for Plaintiff's objection to what he deemed an inappropriately invasive search, Defendant Weaver first "removed six (6) postage stamps from [Plaintiff's] wallet and confiscated them" (id., § IV, ¶ 36) and thereafter fabricated "a disciplinary

report alleging that [Plaintiff] had more than twenty five (25) postage stamps in [his] possession" (id., § IV, ¶ 38).

The brief supporting the instant Motion argues that "Plaintiff's claims related to the confiscation of his stamps as a retaliatory action should be dismissed. . . . The summary judgment materials show that [prison] policy provides that inmates cannot possess more than twenty-five (25) stamps at one time . . . . [Plaintiff] was written up for this infraction and pleaded guilty to the excess stamp charge." (Docket Entry 64 at 22 (citing Docket Entry 64-6, ¶ 14 & Exhs. D, E, as well as Docket Entry 64-7, ¶ 11).) In opposing summary judgment on this retaliation sub-claim, Plaintiff does not contest that he pleaded guilty to the infraction charge at issue. (See Docket Entry 73 at 9-10; Docket Entry 74, ¶¶ 110-18; Docket Entry 76, ¶¶ 10-16.) Given that undisputed evidence (which establishes that Plaintiff possessed excess stamps), he cannot maintain this retaliation sub-claim – either against Defendant Weaver or Defendants Neely, Valliere, Mike Williams, or Leonard (with whom Plaintiff "unsuccessful[ly] communicat[ed]" about Defendant Weaver (Docket Entry 1, § IV, ¶ 39)) – because Plaintiff cannot make out the second element of a retaliation claim, i.e., he cannot show that the alleged adverse action of fabricating an infraction charge actually occurred.[24]

---

[24] Plaintiff's responsive filings appear to attempt to alter this retaliation sub-claim against Defendant Weaver from (A) the
(continued...)

The second retaliation sub-claim focuses on an incident in which an unidentified prison employee to whom the complaint refers as "John/Jane Doe printed, copied, and gave the copies of [an internet news] article of Defendant Peeler's arrest to a prisoner or prisoners to distribute across the facility. The news article did not mention [Plaintiff] by name, but the John/Jane Doe informed the prisoner or prisoners that [Plaintiff] was the prisoner mentioned in the story [as Defendant Peeler's victim]." (Id., § IV, ¶ 49; see also id., § III, ¶ O (listing as final Defendant "John/Jane Doe(s) Prison/Contract Employee(s)").) Presumably, Plaintiff contends that this disclosure constituted an adverse action (in the form of exposure to harassment or retribution by other prisoners) causally connected to his protected activity of grieving his sexual abuse by Defendant Peeler.

---

[24](...continued)
complaint's contention that she retaliated against Plaintiff by fabricating a false infraction charge of possessing excess stamps because he objected to an intrusive search to (B) a claim that Defendant Weaver retaliated against Plaintiff by searching him more thoroughly than other prisoners and confiscating his stamps because he did not talk to her as much as she wanted. (See Docket Entry 74, ¶¶ 109-18; Docket Entry 76, ¶¶ 14-16.) "[A] party may not use [filings] opposing summary judgment to amend a complaint. For that reason, the Court [need] not consider Plaintiff's [new] theory of . . . [this sub-]claim in resolving th[e instant] Motion." Robinson v. Bowser, No. 1:12CV301, 2013 WL 5655434, at *3 (M.D.N.C. Oct. 16, 2013) (unpublished) (internal citation omitted). For that same reason, the Court need not address Plaintiff's suggestion, presented for the first time in his brief and affidavit opposing the instant Motion, that his housing situation somehow constituted retaliation for some unidentified protected activity (see Docket Entry 73 at 9; Docket Entry 74, ¶¶ 106-09).

Despite the opportunity to pursue discovery as to this Doe Defendant's identity, Plaintiff has not moved to amend his complaint to make any such identification. (<u>See</u> Docket Entries dated Sept. 15, 2015, to present.) "[This f]ailure to identify th[is] unknown [Doe Defendant] by the close of discovery [should] result in [his/her] dismissal from this action without prejudice." <u>Dalenko v. Stephens</u>, No. 5:12CV122, 2014 WL 794045, at *10 n.8 (E.D.N.C. Feb. 27, 2014) (unpublished); <u>accord</u> <u>Myers v. DuBrueler</u>, No. 3:15CV56, 2016 WL 3162063, at *2 (N.D. W. Va. June 3, 2016) (unpublished). More importantly for purposes of resolving the instant Motion, neither the complaint's allegations about this sub-claim nor the related averments of Plaintiff's affidavit implicate Defendants who filed the instant Motion in any retaliatory conduct. (<u>See</u> Docket Entry 1, § IV, ¶¶ 49-52; Docket Entry 74, ¶¶ 122-32.)[25]

---

[25] To the extent the complaint would impose liability on Defendant Neely because he learned about the dissemination of the news article, but "took no action" (Docket Entry 1, § IV, ¶ 50), that effort fails as a matter of law, because Plaintiff's affidavit concedes that, after learning about the dissemination of the news article, Defendant Neely offered Plaintiff an opportunity "to go into protective custody" (Docket Entry 74, ¶ 129). In addition, Plaintiff's vague assertions that he engaged in "unsuccessful communication" with Defendants Perry, Solomon, Charlotte Williams, Valliere, Mike Williams, and Leonard about "this issue" (Docket Entry 1, § IV, ¶ 51) and that he "ultimately submitted a grievance, but that too was unsuccessful" (<u>id.</u>; <u>see also</u> Docket Entry 1-1 at 56-60 (setting forth Plaintiff's grievance dated March 11, 2015, with attached copy of news article); Docket Entry 74, ¶ 132 ("On approximately March 11, 2015, I submitted a grievance to prison officials, but prison officials never provided a response to my grievance.")) do not show that said Defendants engaged in retaliation because, inter alia, those assertions do not establish
(continued...)

The complaint's third sub-claim alleges that Defendant Valliere retaliated against Plaintiff for participating in a mediation in a prison-related civil case, in that, "[t]he day after the mediation conference, all of [Plaintiff's] health restrictions were changed, which left [him] ineligible to remain assigned to [his] prison job assignment" (Docket Entry 1, § IV, ¶ 55) and, when Plaintiff visited the prison medical department to have the restrictions corrected, he "was told that Defendant Valliere was the person who requested [Plaintiff's] medical records be changed" (id., § IV, ¶ 56).  Those allegations do not satisfy the second element of a retaliation claim (requiring adverse action sufficient to dissuade a reasonable person from accessing the courts, see Constantine, 411 F.3d at 500), because Plaintiff has acknowledged that, on the day he learned of the change to his restrictions, a prison official took Plaintiff to see a doctor (see Docket Entry 74, ¶¶ 75-82), who immediately "returned [Plaintiff] to [his] previous medical classification" (id., ¶ 84), whereupon Plaintiff "returned to [his] job assignment" (id., ¶ 85).  See Suarez Corp. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000) (holding that "*de minimis* or trivial" actions do not satisfy adverse effect element of First Amendment retaliation claim).

---

[25](...continued)
what Plaintiff communicated to any of them, whether any of them saw his grievance, or what any of them could have done to protect him from harassment/retribution that Defendant Neely's offer of protective custody could not do.

As a fourth retaliation sub-claim, the complaint states that "Defendants Neely, Valliere, and Smith took all of the inventory tools needed to perform [Plaintiff's] job functions adequately and accurately." (Docket Entry 1, § IV, ¶ 57.) The complaint does not give a date for this alleged adverse action or clearly identify the protected activity that purportedly triggered it, but (based on the placement of the discussion of the seizure of the inventory tools immediately after the discussion of the mediation and the alteration of Plaintiff's medical restrictions) the complaint impliedly alleges that a causal connection existed between his participation in the mediation and the seizure of his inventory tools; however, (according to the complaint) the mediation took place "[i]n August 2013" (id., § IV, ¶ 54), and (according to Plaintiff's affidavit) Defendants Neely, Valliere, and Smith did not seize Plaintiff's inventory tools until "approximately April 4, 2014" (Docket Entry 74, ¶ 95). "[T]he passage of more than seven months between . . . [these events] is simply too long to support a finding of retaliation." Graves v. Bank of Am., N.A., 54 F. Supp. 3d 434, 443 (M.D.N.C. 2014); accord Abbott v. MarketStar, No. 3:13CV143, 2013 WL 5561617, at *7 (E.D. Va. Oct. 8, 2013) (unpublished), aff'd, 563 F. App'x 227 (4th Cir. 2014).[26]

---

[26] Nor (in his complaint or affidavit) has Plaintiff "point[ed] to continuing retaliatory conduct and animus directed at h[im] by [Defendants Neely, Valliere, or Smith] in the seven-month period," Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007). (See (continued...)

In contrast, Plaintiff has produced sufficient evidence to fend off summary judgment on his inter-connected fifth and sixth retaliation sub-claims against Defendants Neely and Valliere (for exclusion from certain dining facility areas and the related assessment of a false infraction charge).  As to those two sub-claims, the complaint first avers that, "[i]n May 2014, [Plaintiff] attended a hearing regarding the opposition's motion for summary judgment in [Plaintiff's] pro se civil action [for breach of a settlement agreement with prison officials].  [Plaintiff] prevailed in defeating the motion at that hearing."  (Docket Entry 1, § IV, ¶ 59; see also id., ¶ 61 (describing nature of action).)  According to the complaint, "[t]he day after the hearing, Defendant Smith told [Plaintiff] that Defendants Neely and Valliere ordered that [Plaintiff] was no longer allowed in the Food Service Managers' office. . . .  This banishment . . . ma[de Plaintiff's] job more difficult and discouraging for [him]."  (Id., § IV, ¶ 60.)

Next, the complaint alleges that:

> In July 2014, [Plaintiff] attended the bench trial in the pro se civil action.  An Order was issued that

---

[26](...continued)
Docket Entry 1, § IV, ¶¶ 54-58; Docket Entry 74, ¶¶ 74-85.)  In any event, Plaintiff secured the return of his inventory tools in short order, i.e., on or about April 15, 2014 (see Docket Entry 74, ¶¶ 97-99), such that he did not suffer adversity sufficient to "deter a person of ordinary firmness from the exercise of First Amendment rights," Constantine, 411 F.3d at 500 (internal quotation marks omitted); see also Suarez Corp., 202 F.3d at 686 (rejecting reliance on "de minimis or trivial" events to make out adverse action element of First Amendment retaliation claim).

prison officials comply with portions of [the] previous settlement agreement . . . .

Approximately ninety (90) hours after court ended, Defendant Valliere cited [Plaintiff] with a disciplinary infraction. [He] was accused of being in an unauthorized area from the previous evening when the shift Food Service officer had [Plaintiff] paged to the kitchen . . . .

To [Plaintiff's] knowledge, at least five (5) Food Service staff members provided written testimony supporting [his] defense that [he] was not in an unauthorized area as alleged by Defendant Valliere. However, facility officials would not remove the disciplinary infraction, solely because it was initiated by Defendant Valliere (their) boss). It took a prison official from outside the facility to correct the issue, but it remains on [Plaintiff's] record.

After the disciplinary infraction was resolved, Defendants Neely and Valliere issued a new order that [Plaintiff] was no longer allowed anywhere but the main stockroom. All other auxiliary areas of the Food Service Department were off limits to [Plaintiff]. [He] was the only prisoner to which this new rule applied.

(Id., § IV, ¶¶ 61-64 (paragraph numbers omitted); see also id., § IV, ¶¶ 65 (averring that limitation to stockroom prevented Plaintiff from performing work duties), 66 ("In the summer months, the stock room temperature reached daily temperatures exceeding 90°; some days exceeding 100°."), 67 ("I had to leave the Food Services Department to properly wash my hands."); Docket Entry 74, ¶¶ 101, 102 (detailing difficulties in job performance Plaintiff faced due to restriction from dining facility areas).)

Further, the brief supporting the instant Motion concedes that "Defendant Valliere did write up Plaintiff for being in a staff office. . . . This disciplinary action was eventually dismissed

. . . . The disciplinary investigation, however, does not get purged from the system." (Docket Entry 64 at 8; see also id. at 9 ("Because of Plaintiff's penchant for entering staff offices frequently, Defendant Valliere and Defendant Neely did give Defendant Smith lawful orders not to allow Plaintiff beyond the threshold of the Correctional Food Service Manager's office[,] the Food Service Commissary, the walk-in coolers, and freezers.").)

Given these concessions and Plaintiff's above-discussed evidence regarding his First Amendment-protected activity of accessing the courts (by opposing prison officials' summary judgment motion and proceeding to trial on his claim for breach of a settlement agreement), followed very close in time by imposition of (A) restrictions on Plaintiff's ability to access dining facility areas he previously freely had accessed and which he needed to access to reasonably perform his job, to avoid prolonged exposure to extreme heat, and to maintain proper sanitation, as well as (B) a related, unjustified disciplinary charge (which, even after its dismissal, remained on his record in some form), a reasonable fact-finder could conclude that Plaintiff "establish[ed the required] three elements [for a retaliation claim]: (1) his speech was protected, (2) the alleged retaliatory action adversely affected his protected speech, and (3) a causal relationship

between the protected speech and the retaliation," <u>Raub</u>, 785 F.3d at 885 (internal quotation marks omitted).[27]

Plaintiff's seventh retaliation sub-claim rests on the bald assertion that "Defendant Livengood refused to allow [Plaintiff] assignment to the Enterprise Industry . . . because [Plaintiff] had successfully turned to the courts for help in the past." (Docket

---

[27] Defendant Valliere has sworn (A) that Plaintiff "was not the only inmate directed to stay out of staff offices" (Docket Entry 64-6, ¶ 18; <u>see also</u> <u>id.</u>, ¶ 21 ("While [Plaintiff] was the driving force in management's decision to limit or eliminate inmates spending inordinate amounts of time in staff offices, he was not singled out.")) and (B) that the infraction charge at issue "had nothing to do with any court appearances" (<u>id.</u>, ¶ 19). That "materially conflicting version[] of events [simply] cannot be reconciled [with Plaintiff's account] . . . without weighing credibility, which this [C]ourt is precluded from doing at this stage. Accordingly, it will be for the jury to determine whose version of the facts to credit." <u>Safford v. Barnes</u>, No. 1:14CV267, 2016 WL 3580752, at *5 (M.D.N.C. June 28, 2016) (unpublished). Conversely, the Court should enter judgment as a matter of law against Plaintiff on these retaliation sub-claims to the extent the complaint purports to seek relief against any other Defendant based on the cryptic averment that Plaintiff "made numerous attempts to resolve <u>these issues</u> through unsuccessful communication with prison officials" (Docket Entry 1, § IV, ¶ 70 (emphasis added)), without making clear the issues to which he referred (from among the numerous issues the complaint discussed in the paragraphs between that averment and the last averment of that sort (<u>see</u> <u>id.</u>, § IV, ¶¶ 51-69)). Further, although Plaintiff apparently did submit a grievance objecting to his exclusion from certain dining facility areas (<u>see</u> Docket Entry 1-1 at 11-15), he has not shown that any other Defendant who saw that grievance endorsed or perpetuated any retaliation against Plaintiff (<u>see</u> Docket Entry 1, § IV, ¶ 70; Docket Entry 74, ¶ 105); to the contrary, Plaintiff's own documents reflect that, in response to his grievance, he "met with [Defendant] Neely, [Defendant] Valliere, [Defendant Mike] Williams, and [Defendant] Leonard" (Docket Entry 1-1 at 89), who clarified (or modified) any restriction on accessing dining facility areas to provide that, "[i]f [Plaintiff] or any other inmate's job requirements/duties need for them to be in an office, then they are allowed to be there for that purpose only" (<u>id.</u> at 90).

Entry 1, § IV, ¶ 69.) "[C]onclusory allegations are wholly insufficient to state a First Amendment retaliation claim." Blackwell v. Houser, No. 5:16CV67, 2017 WL 4684188, at *10 (W.D.N.C. Oct. 18, 2017) (unpublished), aff'd, 719 F. App'x 263 (4th Cir. 2018). Moreover, neither Plaintiff's grievance regarding his failure to obtain a position in the Enterprise Plant nor the related provisions of his affidavit provide any basis from which a reasonable fact-finder could conclude that Defendant Livengood even knew about Plaintiff's litigation history. (See Docket Entry 1-1 at 53; Docket Entry 74, ¶¶ 26-32.) Without such evidence, this claim fails as a matter of law. See Constantine, 411 F.3d at 501 ("In order to establish th[e required] causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.").[28]

Finally, as an eighth retaliation sub-claim, Plaintiff's complaint cites his transfer, "[o]n approximately June 18, 2015," to a prison "farther from [his] home." (Docket Entry 1, § IV, ¶ 72.) Assuming that transfer occurred "because of [his] civil litigation" (id., § IV, ¶ 73), and Plaintiff sufficiently connected any Defendant to the transfer decision (or at least the failure to

_____

[28] Plaintiff also has failed to adduce any evidence from which a reasonable fact-finder could infer that retaliation for protected activity caused any other Defendant to whom Plaintiff may have complained about his inability to secure a job in the Enterprise Plant to refuse to intercede in some manner to force Defendant Livengood to hire Plaintiff. (See Docket Entry 1, § IV, ¶ 70; Docket Entry 1-1 at 53; Docket Entry 74, ¶¶ 26-32.)

reverse it after Plaintiff complained (see id., § IV, ¶ 74)), this sub-claim still falters on the second (adverse action) element required for a retaliation claim. See Hoye v. Gilmore, 691 F. App'x 764, 765 (4th Cir. 2017) ("[The plaintiff] has not shown an adverse action. [He] alleges that as a result of his transfer, he is now located in a prison farther away from his family . . . . [S]ince prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct. Ultimately, the transfer may have inconvenienced [the plaintiff], but it did not chill, impair, or deny his exercise of First Amendment rights." (internal brackets, citation, and quotation marks omitted)).

## CONCLUSION

The instant Motion does not address Plaintiff's inadequate legal services claim. His claims for failure to answer grievances and disability discrimination fail as a matter of law against all Defendants who filed the instant Motion. A material question of fact exists as to Plaintiff's claim that Defendants Valliere, Smith, and Hurlocker failed to prevent Plaintiff's sexual abuse by Defendant Peeler; however, Plaintiff has failed to raise a triable issue on that claim as to all other Defendants who filed the instant Motion. The record similarly warrants allowing Plaintiff to proceed on his claims for failure to supervise/train against

Defendants Valliere and Smith, but not the other Defendants who filed the instant Motion.  Lastly, Plaintiff only has produced sufficient evidence to avoid summary judgment on his retaliation claim against Defendants Neely and Valliere; that claim falls short as to all other Defendants who filed the instant Motion.[29]

---

[29] This Recommendation thus proposes that (apart from reserving any determination about the viability of Plaintiff's inadequate legal services claim) the Court allow three claims (failure to prevent sexual abuse, failure to supervise/train, and retaliation) to go forward against three (different but partially overlapping) sets of four (total) Defendants (Neely, Valliere, Smith, and Hurlocker), because the record reflects material factual disputes about whether those Defendants committed those federal constitutional violations.  The brief in support of the instant Motion nominally raises qualified immunity as an alternative grounds for summary judgment; however, in doing so, it relies not on the clearly-established-right prong of the qualified immunity defense, see generally Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013) ("A qualified immunity inquiry involves two steps.  A court generally considers first, whether a constitutional violation occurred, and second, when the court finds such a violation, whether the right violated was 'clearly established' at the time of the official's conduct."), but rather only on the argument (already addressed in the Discussion above) that "no constitutional violation has been shown" (Docket Entry 64 at 23; see also id. at 24 ("[T]he summary judgment materials show Plaintiff's federal constitutional rights have not been violated.")).  Additionally, as noted in the Background section, the complaint names each Defendant in his/her individual and official capacities.  Although an official capacity claim effectively lies against the individual defendant's governmental employer (here, as to all Defendants, the North Carolina Department of Public Safety) and therefore raises additional issues beyond whether a triable claim exists as to an individual defendant, see generally Will v. Michigan Dep't of State Police, 491 U.S. 58, 63-71 & nn.7, 10 (1989), the brief supporting the instant Motion did not make any argument challenging the official capacity aspect of any claim (see Docket Entry 64 at 10-24).  Accordingly, this Recommendation has not addressed such matters.  See generally Fed. R. Civ. P. 56(f).

**IT IS THEREFORE RECOMMENDED** that the instant Motion (Docket Entry 63) be granted in part and denied in part, in that the Court:

1) should <u>not</u> enter summary judgment against Plaintiff on his inadequate legal services claim <u>at this point</u>;

2) should grant summary judgment for Defendants Perry, Solomon, Huggins, Charlotte Williams, Neely, Valliere, Mike Williams, Livengood, Smith, Leonard, Hurlocker, and Weaver (i.e., all Defendants who filed the instant Motion) on Plaintiff's claims for failure to answer grievances and disability discrimination;

3) should grant summary judgment for Defendants Perry, Solomon, Huggins, Charlotte Williams, Neely, Mike Williams, Livengood, Leonard, and Weaver on Plaintiff's claim for failure to prevent sexual abuse;

4) should deny summary judgment for Defendants Valliere, Smith, and Hurlocker on Plaintiff's claim for failure to prevent sexual abuse;

5) should grant summary judgment for Defendants Perry, Solomon, Huggins, Charlotte Williams, Neely, Mike Williams, Livengood, Leonard, Hurlocker, and Weaver on Plaintiff's claim for failure to supervise/train;

6) should deny summary judgment for Defendants Valliere and Smith on Plaintiff's claim for failure to supervise/train;

7) should grant summary judgment for Defendants Perry, Solomon, Huggins, Charlotte Williams, Mike Williams, Livengood,

Smith, Leonard, Hurlocker, and Weaver on Plaintiff's claim for retaliation; and

8) should deny summary judgment for Defendants Neely and Valliere on Plaintiff's claim for retaliation in connection with his exclusion from certain dining facility areas and a related infraction charge.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**

August 2, 2018